Exhibit K – Declaration of Christine Burke

(2006-2007 Contract)



2 Gannett Drive
South Portland, Maine 04106-6911

# MEA BENEFITS TRUST GROUP AGREEMENT
## July 1, 2006 – June 30, 2007

### 1. Definitions

This section explains the meanings of some of the words used in this Group Agreement.

| | |
|---|---|
| Amendment | An addition, change, correction, or revision to the terms and conditions of the Subscriber's Certificate. |
| Association | The Blue Cross and Blue Shield Association, an association of Independent Blue Cross and Blue Shield Plans. |
| Benefits | Payments We make on Your behalf for covered services under the Contract. |
| Certificate | The document that specifies the Benefits available to Members under the Contract. |
| COBRA | Consolidated Omnibus Budget Reconciliation Act of 1985, as amended. |
| Coinsurance | The percentage we pay toward the cost of some covered services and the percentage you pay. |
| Contingent Payment | A negotiated retroactive payment to Anthem BCBS by the Group if there is a premium loss as determined by the Refund Settlement in the stated contract period. |
| Contract | This Group Agreement, Attachments, any Certificates, Amendments, Summaries of Benefits, the Rate Sheet, and Refund Agreement. |
| Copayment | A fixed dollar amount or percentage required to be paid by each member for certain covered services under this Contract. |
| Coverage | The extent to which Benefits are available to Members in accordance with the eligibility criteria stated in the Contract. |
| Covered Employee | An employee or former employee (retiree) of a school district and/or other educational entity that has entered into a collective bargaining agreement with the Maine Education Association and is covered under the MEA Benefits Trust and who meets the eligibility criteria stated in the Contract and who has been accepted for Coverage. |
| Deductible | The amount the Member may be required to pay each year toward the Maximum Allowance for certain covered services before t Contract provides benefits. |
| DOL Regulations | United States Department of Labor Regulations. |
| Effective Date | The date that Coverage begins. |
| ERISA | The Employee Retirement Income Security Act of 1974, as amended. |
| Exclusion | Services for which We will not provide Benefits. |
| Financing Agreement | An agreement between the Group and Us that provides an alternative means to pay subscription charges. |
| Grace Period | The 31 days that begin with and follow the due date of an unpaid Subscription Charge. |
| Group | The employer, association, or trust that applies for and accepts this Coverage on behalf of its Members under this Contract. |
| Group Agreement | This document including attachments. |
| HIPAA | Health Insurance Portability and Accountability Act of 1996. |
| Identification Card | The card We issue showing the Subscriber or Member name and certificate number. |
| Maximum Allowance | The highest dollar amount we will pay for a covered service based on our contracts with providers, professionals and our pharmacy benefit manager. |
| Medicare | Title XVIII of the United States Social Security Act, Medical Care For the Aged and Disabled. |
| Member | The Subscriber and all family Members who are eligible for Coverage and who have been accepted for Coverage under their Certificate. |
| OBRA | Omnibus Budget Reconciliation Act of 1986. |
| Our | See definition of "We, Us, or Our". |
| Producer | An independent contractor licensed to engage in insurance producer activities. |
| Prescription Order | An order for medication given by a properly authorized person to a person properly authorized to dispense the order. |
| Rate Sheet | The document that lists rates for Coverage under this Contract. |
| Renewal Date | The date set by Anthem BCBS and the Group on which the Group Contract renews each year. |
| Subscriber | The person who applied for Coverage under this Contract and whose application and payment of required Subscription Charges We have accepted. |
| Subscription Charge | The rates established by us as consideration for Benefits offered in this Contract. |
| Summary of Benefits | An attachment to the Certificate which lists the level of Coverage of Benefits. |
| TEFRA | Tax Equity and Fiscal Responsibility Act of 1982 and Deficit Reduction Act of 1984. |
| Termination | The date on which Coverage ends. |
| Underwriting Guidelines | The criteria developed to determine eligibility for Coverage. |
| We, Us, or Our | Anthem Blue Cross and Blue Shield. |
| You or Your | The Group that has entered into this Contract as shown by the authorized signatures on the Group Agreement and the Refund Agreement. |

Anthem Health Plans of Maine, Inc. d/b/a/ Anthem Blue Cross and Blue Shield (Anthem BCBS) will provide Benefits for covered Members. We will provide benefits to these Members who initially meet and continue to meet the eligibility requirements of the Contract.

### 2. General Terms of this Group Agreement

The Group Agreement and Contract will be effective from July 1, 2006 through June 30, 2007 unless the Group or Anthem BCBS gives written notice of Termination, pursuant to Section 6. The complete Contract for Coverage between the Group and Anthem BCBS is comprised of the following documents: 1) This Group Agreement; 2) Attachments; 3) any Certificates; 4) Amendments; 5) Summaries of Benefits; 6) the Rate Sheet; and 7) Refund Agreement.

ORIGINAL
NO. 2 OF 4

We reserve the right to cease offering a product line in accordance with the requirements of applicable Maine law. Notwithstanding the above Anthem BCBS at your direction will provide notice of changes in the contract for coverage to covered subscribers. In the event that We are subject to federal or state laws or regulations mandating a change in the Benefits of the program or in the eligibility of covered Members, We will implement such mandatory change. This change will be made on the effective date stated in the law. If necessary, these changes will be made with adjustments to the subscription charges indicated on the monthly invoice. If subscription charges are to be increased, We will give 90 days prior written notice. When You are subject to Federal or State laws or regulations requiring a benefit change, You must provide Us with prior notice of the change prior to the effective date.

We will not be liable for any claims or damages that result from your failure to comply with any laws or regulations. This includes but is not limited to the Medicare secondary payor laws or regulations, COBRA, DOL Regulations, HIPAA, OBRA, and TEFRA. Anthem will not hold You liable for any claims or damages that result from errors or omissions made by any Anthem employee. You agree to hold Us harmless from and against any charges that may be assessed against Us at any time due to your failure to comply with laws or regulations or your failure to notify Us of any change in your status.

We reserve the right to review your financial condition by obtaining appropriate financial statements and credit information.

For claims audits, procedures audits, health improvement audits, disease management audits, utilization review audits, provider discount audits or any other audits performed by an outside vendor, accounting firm, or consultant, the initial 100 hours of Anthem BCBS personnel time in assisting with or providing information for the audit is included in the premium charged. Time in excess of the initial 100 hours up to an additional 50 hours for such audits will be billed at the rate of $75 per hour per Anthem BCBS employee involved in the audit, plus reasonable expenses (e.g. computer programming expenses) incurred by Anthem BCBS in connection with the audit. Cost for audits over the initial 150 hours will need to be negotiated.

You are the Plan Administrator and are responsible for complying with all applicable provisions of ERISA, as amended. In particular, You are responsible for providing your covered Subscribers with copies of the: 1) employee handbooks or Certificate and Amendment(s); 2) Identification cards; and 3) the Summary of Benefits. You are also responsible for providing employees, and their spouses and dependents with all required notices and communications relating to their rights under ERISA, COBRA and Federal or State law to elect to continue Coverage upon termination of employment or other qualifying event. In consideration of the subscription charges, Anthem BCBS, at your direction will provide the listed materials to plan participants. We are not responsible for any Benefits or services that must be provided under any applicable employer's liability or indemnification law or workers' compensation act.

You hereby acknowledge that this Group Agreement and Contract constitute an agreement solely between You and Anthem BCBS, that Anthem BCBS is an independent corporation operating under a license with the Association permitting Anthem BCBS to use the Blue Cross and Blue Shield Service Marks in the state of Maine, and that Anthem BCBS is not contracting as the agent of the Association. You further acknowledge and agree that You have not entered into this Group Agreement and Contract based on representations by any person other than Anthem BCBS and that no person, entity, or organization other than Anthem BCBS shall be held accountable or liable to You for any of Anthem BCBS's obligations created under this Group Agreement and Contract. This paragraph shall not create any additional obligations whatsoever on the part of Anthem BCBS other than those created under other provisions of this Group Agreement and Contract.

This Group Agreement may be amended only by a written agreement of both parties. A waiver of any breach of this Group Agreement and Contract will not be construed to be a continuing waiver of a similar breach. A waiver must be in writing and signed by authorized representatives of both parties to be effective.

### 3. Enrollment and Membership Requirements

We will administer the enrollment and membership requirements consistent with the MEA Benefits Trust Health Plan's "Administrative Guidelines" amended October 2002 and in accordance with State and Federal law. We require that all enrolled individuals initially meet and continue to meet the eligibility requirements of the Contract. All employees who submit applications for enrollment into the group health plan are expected to have worked at least the minimum hours each week during the entire waiting period prior to enrollment. All employees who remain enrolled must continue to work at least the minimum hours each week. Anthem BCBS will not be responsible for any claims or expenses associated with an individual not eligible for the group health plan.

## 4. Benefits

We will provide the Benefits detailed in the: 1) Certificate; 2) Amendment(s); and 3) Summary of Benefits. A claim for Benefits for a covered service must be received no later than the timeframe stated in the Contract documents. Members will be held harmless for claims not submitted timely by an Anthem or BlueCard participating provider or professional. BlueCard participating providers are expected to comply with their plan's contract provisions regarding the timely filing of claims. No action may be brought against Us for failure to provide Benefits unless brought within three (3) years from the time the cause of action arises.

### A. BlueCard

Like all Blue Cross and Blue Shield Licensees, Anthem BCBS participates in a program called "BlueCard". Whenever Members access health care services outside the geographic area We serve, the claim for those services may be processed through BlueCard and presented to Us for payment in conformity with network access rules of the BlueCard Policies then in effect ("Policies"). Under BlueCard, when Members receive covered health care services within the geographic area served by an on-site Blue Cross and/or Blue Shield Licensee ("Host Blue"), We will remain responsible to the Group for fulfilling Our contract obligations. However, the Host Blue will only be responsible, in accordance with applicable BlueCard Policies, if any, for providing such services as contracting with its participating providers and handling all interaction with its participating providers. The financial terms of BlueCard are described generally below.

#### i. Liability Calculation Method Per Claim

The calculation of Member liability on claims for covered health care services incurred outside the geographic area We serve and processed through BlueCard will be based on the lower of the provider's billed charges or the negotiated price We pay the Host Blue.

The methods employed by a Host Blue to determine a negotiated price will vary among Host Blues based on the terms of each Host Blue's provider contracts. The negotiated price paid to a Host Blue by Us on a claim for health care services processed through BlueCard may represent:

(i) the actual price paid on the claim by the Host Blue to the health care provider ("Actual Price"), or

(ii) an estimated price, determined by the Host Blue in accordance with BlueCard Policies, based on the Actual Price increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Blue's health care providers or one or more particular providers ("Estimated Price"), or

(iii) an average price, determined by the Host Blue in accordance with BlueCard Policies, based on a billed charges discount representing the Host Blue's average savings expected after settlements, withholds, any other contingent payment arrangements and non-claims transactions for all of its providers or for a specified group of providers ("Average Price"). An Average Price may result in greater variation to the Member and the Group from the Actual Price than would an Estimated Price.

Host Blues using either the Estimated Price or Average Price will, in accordance with BlueCard Policies, prospectively increase or reduce the Estimated Price or Average Price to correct for over- or underestimation of past prices. However, the amount paid by the Member is a final price and will not be affected by such prospective adjustment.

Statutes in a small number of states may require a Host Blue either (1) to use a basis for calculating Member liability for covered health care services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (2) to add a surcharge. Should any state statutes mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, the Host Blue would then calculate Member liability for any covered health care services in accordance with the applicable state statute in effect at the time the Member received those services.

#### ii. Return of Overpayments

Under BlueCard, recoveries from a Host Blue or from participating providers of a Host Blue can arise in several ways, including, but not limited to, anti-fraud and abuse audits, provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Blue will engage third parties to assist in discovery or collection of recovery amounts. The fees of such a third party are netted against the recovery. Recovery amounts, net of fees, if any, will be applied in accordance with applicable BlueCard Policies, which generally require correction on a claim-by-claim or prospective basis.

### B. Prescription Orders

Payments, Coinsurance, and Deductible amounts for Prescription Orders are based on the lesser of the submitted charge or Maximum Allowance at the applicable point of sale. Any rebates or other funds received by Us from drug manufacturers or similar vendors are excluded from the calculation of the Maximum Allowance and will be retained By Anthem BCBS, except as otherwise provided in the Refund Agreement.

### C. Discount Sharing

Members who have coinsurance responsibility that is based on a percentage, will pay their coinsurance percentage based on the hospital's or provider's discounted charge or negotiated amount, or our maximum allowance for professionals, except that BlueCard Program-eligible Members will share in discounts for BlueCard claims in accordance with the procedure in subsection A, BlueCard, above.

## 5. Reports

You will be provided with group specific reports consistent with applicable Federal and State law, which will include all of the premium, claims and capitation data that has been provided in the past, and such other reports as shall be needed to evaluate the contract renewal rates and to verify the calculations in the Refund Agreement. You agree to maintain the information contained in these reports as confidential. You will use any information We make available solely for the purpose of administering your group health plan under this Group Agreement and Contract. You agree to hold Us harmless for any claim, action, or loss that may arise at any time out of your unauthorized use of this information. If You use the information for another purpose, We will consider that a material breach of this Group Agreement and Contract, and may terminate it without notice.

All experience data relative to the MEABT and its subgroups is owned by the Trust, and that data will not be released, either directly or indirectly, by Anthem without the prior written consent of the Trust, and the Trust can withhold its permission for any reason it deems appropriate. Additionally, Anthem agrees not to utilize data relating to specific active subgroups for standalone rating purposes.

## 6. Payment and Termination

Each subgroup must pay the total of all Subscription Charges to Us by the due date indicated on each invoice. If full payment is not received on or before the due date, We may, with prior notice, terminate the Coverage of the subgroup of the Trust. Notice of Termination will be sent to your covered Members in accordance with Maine law. The notice will be rescinded if, within the Grace Period, the subgroup makes full payment of all amounts owed. Claims will not be paid for services rendered after the date of Termination, except for the Grace Period, unless Coverage has been reinstated. The rates set forth in the Rate Sheet are subject to change by Anthem BCBS upon 90 days prior written notice to the Group if the number of Members covered by this Group Agreement and Contract changes by more than 10% or if Anthem BCBS must comply with new or additional benefits mandated by the Legislature.

This Group Agreement may be terminated immediately upon written notice for material breach, fraud, or misrepresentation. The Group Agreement may be terminated at any time upon prior 90 day written notice of the other party, effective on the first of the month following the date the written notice is received by the other party. The 90 day written notice of termination by the Group must be delivered to Anthem BCBS; notice delivered to the Producer is not sufficient to terminate the Group's Contract.

## 7. Special Terms

a.) Retention under this Agreement is: PPO - MEA Standard Plan $18.36 pmpm; Managed Care - MEA Choice Plus - $18.36 pmpm; and Group Companion Plan - $16.09 pmpm, plus 5.0% of PPO premium, 3.0% of Managed Care premium and 5.0% of Group Companion Plan premium, plus the following negotiated amounts for consultant fees which shall be paid by Anthem BCBS directly to the vendors on behalf of the Group:

> Marsh: $50,000 ($25,000 for 7/2006-12/2006 and $25,000 for 1/2007-6/2007)
> MHIC: $74,000 ($37,000 for 7/2006-12/2006 and $37,000 for 1/2007-6/2007)

Additional Fees Payable By MEA:
- 1.25% of premium will be applied to cover claims in excess of the $300,000 Pooling Level per member. The Pooling Charge and the Pooled Claims do not apply to Group Companion Plan Members.
- Anthem Rewards - A fee of $0.26 pmpm will be charged for PPO, Managed Care and Group Companion Plan members for this contract period.
- Anthem Prescription Management – An administration fee of $0.47 pmpm will be charged for PPO, Managed Care and Group Companion Plan members for this contract period.
- The Anthem Behavioral Health fee is $1.00 pmpm for this Contract period. This charge does not apply to Group Companion Plan Members.

b.) Care Management is included in the fixed $18.36 pmpm for PPO and Managed Care Members. Care Management is not charged to Group Companion Plan Members.

c.) Anthem Blue Cross and Blue Shield's profit charge for the contract years beginning 7/1/2006 is 3.0% of premium and is included as part of the charge specified in Section 7(a) above.

d.) The Refund Agreement attached hereto is incorporated into this Agreement. For the 2006 – 2007 contract period, the Refund Agreement will have a risk margin of 0.25% of premium. Should the Refund Agreement Settlement for the 2006 – 2007 contract period result in a loss, the Group will pay Anthem BCBS an amount equal to the excess loss but no more than 0.25% of total premium. If there is a gain for the same contract period, the 0.25% risk margin will be waived.

e.) Benefits provided to retirees eligible for Medicare will be those set forth in the Group Companion Plan Certificate of Coverage. Claims experience of the retirees on Group Companion Plan will be combined with that of the actives for the purpose of calculating the refund settlement.

f.) Anthem BCBS will charge the agreed upon rates to all new subgroups that join the MEA Benefits Trust during the term of this Agreement.

g.) Anthem BCBS will remit to the MEA Benefits Trust, on a monthly basis, an administrative fee equal to 0.6% of the billed monthly premium, including the additional monthly premium paid by the Group as provided in Section 7(e) above.

## 8. Authorization

The Group Agreement and Contract constitute the parties' entire understanding and supersedes all prior representations and understandings, and will be governed by the laws of the state of Maine without regard to its rules regarding conflict of laws. No Producer has the authority to change any term or waive any provision of this Group Agreement. Any changes to the terms and conditions of this Group Agreement must be initialed by both parties.

This Agreement has been executed in duplicate by the authorized representatives whose signatures appear below:

Anthem BCBS
By: [signature]
Title: PRESIDENT
Date: July 6, 2006

MEA Benefits Trust
By: [signature]
Title: Executive Director
Date: June 30, 2006

058009 R07/2006

## REFUND AGREEMENT
### between
### ANTHEM HEALTH PLANS OF MAINE, INC.
### d/b/a Anthem Blue Cross and Blue Shield (herein called Anthem BCBS)
### and
### MAINE EDUCATION ASSOCIATION BENEFITS TRUST
### (herein called the Group)

1.  **CONTRACT PERIOD COVERED:** July 1, 2006 through June 30, 2007 or the date of termination whichever is earlier (hereinafter "Contract Period").

2.  **CONTINUITY PROVISION**
    If this Agreement replaces any prior financing agreements, Anthem BCBS reserves the right to carry forward any balance, positive or negative, resulting from the final settlements of such financing agreements to the fluctuating reserve established under this Agreement, per the terms of paragraph 4. FLUCTUATING RESERVE.

3.  **ELEMENTS OF SETTLEMENT**
    a)  Income is the total premium amount received and receivable by Anthem BCBS from the Group applicable to the Contract Period. Any amounts within the total premium received or receivable for retention will be removed from Income for purposes of the settlement. The elements of retention charged for the contract period are set forth in Section 7. Special Terms, subsection a.) of the MEA Benefits Trust Group Agreement.

    b)  Incurred Claims is the amount of contractual and Non-Capitated Service benefits processed for payment by Anthem BCBS (hereinafter collectively "Benefits") on behalf of Members during the Contract Period, less Pooled Claims, plus a reserve for Benefits received by Members but not processed for payment during the Contract Period (this reserve shall not include any explicit claims reserve greater than the Pooling Level for any one member), less the reserve established at the end of the immediate, prior Contract Period for Benefits received by Members not yet processed for payment.

    c)  Pooled Claims is the amount of claims processed for payments during the contract period that exceed the Pooling Level.

    d)  Pooling Level is the maximum amount of Benefits processed for payment for any Members, which shall be included within Paid Claims for which an account shall be liable.

    e)  Capitation (if applicable) and Mental Health/Substance Abuse Management Fees (if applicable) are fixed amounts paid by Anthem BCBS for services for enrolled Members of the Group including, but not limited to, provider incentive payments and additional distributions made to providers as a result of the financial performance of the Plan.

    f)  Prescription Drug Rebate for the 2006 – 2007 contract period: a rebate credit of $3,034,743 will be applied to Incurred Claims.

    g)  Non-Capitated Services are services provided Members by Anthem BCBS that are not subject to capitation payments.

    h)  Retention is the amount required by Anthem BCBS to support the administration of the benefits provided under the MEA Benefits Trust Group Agreement(s). Retention elements include general office expense, claims administration expense, profit charge, pooling charge, and any other retention items or credits included in the rates for the Contract Period.

    i)  Pooling Charge is the amount required by Anthem BCBS to support the risk of including the $300,000 Pooling Level in the rates effective during the Contract Period.

4.  **FLUCTUATING RESERVE**
    a)  A fluctuating reserve is hereby established and shall remain in effect until this Agreement is terminated.

ORIGINAL
NO. 2 OF 4

b) The fluctuating reserve shall be credited with any gain or loss resulting from the settlement of a Contract Period according to the terms of paragraph 5. DETERMINATION OF THE REFUND AMOUNT, and paragraph 6. TERMINATION, if applicable.

c) The fluctuating reserve shall be reduced by the amount of the actual Savings Offset Payment specific to the Group based on the assessment percentage dictated by the Dirigo Board through the Dirigo Health Agency and applicable to Medical claims incurred and paid between 7/1/2006 - 6/30/2007 for Active (Non-Retiree) participants.

5. **DETERMINATION OF THE REFUND AMOUNT**
   a) The net gain (or loss) for the Contract Period will be determined by reducing the amount of Income applicable to the Contract Period by the sum of the Incurred Claims, the Prescription Drug Rebate credit, Capitation (if applicable), Mental Health/Substance Abuse Management Fees (if applicable), and Retention.

   b) If a net gain results and there is a zero or positive balance in the fluctuating reserve, the Group shall receive a refund equal to 80% of the net gain.

   c) If a gain results and there is a negative balance in the fluctuating reserve, the net gain will be applied against such negative balance by first offsetting said net gain against the earliest Contract Period's net loss giving rise to the negative balance. Once that Contract Period's net loss is extinguished, any remaining net gain shall be offset against the next successive Contract Period's net loss, etc. until all such Contract Period net losses are extinguished. If the net gain exceeds the amount of the negative balance, then the excess will be distributed as in b) above.

   d) For the Contract Period 2006 - 2007, the Refund Agreement will have a risk margin of 0.25%. Should the Refund Settlement result in a loss, the Group will pay Anthem BCBS an amount equal to that excess loss but no more than 0.25% of total premium. If the total net loss is in excess of the risk margin of 0.25%, the fluctuating reserve will be adjusted to reflect the excess net loss. In the event the reserve balance is not sufficient to offset the excess net loss and a negative balance results, any future net gains will be applied against the negative balance as in c) above. If there is a gain for the same Contract Period, the 0.25% risk margin will be waived.

   e) For purposes of any settlement, any part of a negative balance in the fluctuating reserve applicable to losses occurring in the Contract Period prior to the last three Contract Periods that immediately precede the Contract Period covered by this Agreement, shall be deleted from the fluctuating reserve.

   f) If at the time of settlement, the balance of the fluctuating reserve should exceed fifteen percent (15%) of the income applicable to the settlement period, the excess shall be refunded to the Group.

6. **TERMINATION**
   a) This Agreement shall automatically terminate upon the occurrence of the earliest of the following:
      1) At the end of the Contract Period covered.
      2) On the date the MEA Benefits Trust Group Agreement(s) is terminated.
      3) On the date which the Group enrollment falls below 100 subscribers.

   b) If the Group terminates this Agreement, the Group is not eligible for a new agreement for three (3) years from the termination date of this Agreement.

   c) If this Agreement is terminated for any reason, a new or revised Agreement may be offered at the sole discretion of Anthem BCBS.

   d) If this Agreement is immediately renewed by the Parties, the settlement will be made within five (5) months of the expiration of the Contract Period in effect immediately preceding the renewal, according to the terms of paragraph 5. DETERMINATION OF THE REFUND AMOUNT. If this Agreement is not renewed by the Parties or is terminated per the terms of paragraph 6(a)(2), 6(a)(3) or 6(b), a final settlement for the last Contract Period covered by this Agreement will be made within eighteen (18) months of the termination date of this Agreement according to the terms of paragraph 5. DETERMINATION OF THE REFUND AMOUNT. In the

event of non-renewal or termination of this Agreement, any amounts remaining in the fluctuating reserve will be retained by Anthem BCBS.

e) If the Group has been continuously enrolled under a benefit plan with Anthem BCBS or their subsidiaries or affiliates, through the 18-month period described in paragraph 6(d) above, any refund generated by the final settlement will be made according to the terms specified in 5(b) or 5(c), whichever is applicable; otherwise no refund will be made.

NOTHING HEREIN shall alter any of the provisions of the MEA Benefits Trust Group Agreement(s), or attached riders or amendments.

| Dated: July 6, 2006 | Dated: June 30, 2006 |
|---|---|
| Anthem Health Plans of Maine, Inc. | MEA Benefits Trust |
| By: [signature] | By: [signature] Robert M. Gibbons |
| Title: PRESIDENT | Title: Executive Director |

058008 R07/2006
u:\ourdocs\word\major\moa\moarefundagreement00.doc

## ATTACHMENT A TO THE MEA BENEFITS TRUST GROUP AGREEMENT

This Attachment A to the MEA Benefits Trust Group Agreement ("Attachment") is made and entered into on this 1st day of July, 2006, by and between Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield, a Maine corporation ("Anthem BCBS"), and MEA Benefits Trust ("MEABT").

### RECITALS

WHEREAS the Maine Legislature enacted the Maine Unfair Prescription Drug Practices Act, 22 M.R.S.A. § 2699, ("UPDPA") to be effective on September 13, 2003;

WHEREAS the UPDPA will, if maintained in its current form, impose certain disclosure and financial obligations on "pharmacy benefits managers" for the benefit of "covered entit[ies]", as those terms are defined in the UPDPA;

WHEREAS the parties acknowledge and agree that the MEABT receives, through Anthem BCBS and/or its affiliates, benefits related to prescription drugs, including pharmacy claims processing, pharmacy mail service, access to a national network of pharmacies, negotiated discounts on the cost of drugs, reduction in the retention loads resulting in lower premium rates, procurement of rebates, customer service and clinical and disease management programs (collectively the "Pharmacy Services");

WHEREAS the parties acknowledge and agree that Anthem BCBS and/or its affiliates receive payments or benefits for the dispensation of prescription drugs within the State based on volume of sales for certain prescription drugs or classes or brands of drugs and drug substitutions applicable to the claims associated with the MEA Benefits Trust Group Agreement in the form of drug rebates, and an allocation of discount payments based on aggregate mail order prescription drug sales of the combined multi-state Anthem plans, which discounts are not applicable to the claims associated with the MEA Benefits Trust Group Agreement or any other specific covered entity, but rather inure to the benefit of all Anthem BCBS covered entities and insureds equally through a reduction in retention loads and, ultimately, of premium rates;

WHEREAS the parties to this Attachment herein seek to make clear the exercise of each party's respective rights and obligations under the UPDPA with respect to the Attachment and MEA Benefits Trust Group Agreement, should the UPDPA apply to the Attachment and MEA Benefits Trust Group Agreement;

WHEREAS Anthem BCBS has agreed to greater transparency in the rebates it receives related to prescription drugs, irrespective of the applicability of UPDPA to Anthem BCBS, and to disclosure of information to an extent that will not increase the overall cost of prescription drug benefits provided under the Attachment and MEA Benefits Trust Group Agreement;

NOW THEREFORE, in consideration of the foregoing, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree to the following:

{W0187266.3}

**ORIGINAL**
**NO. 2 OF 4**

## AGREEMENT

1. For the July 1, 2006 to June 30, 2007 contract year and each subsequent contract year in which the rebate terms are as described in Paragraph 1(B) below and the refund charge included in the MEA Refund Agreement for that subsequent contract year is equal to or less than the refund charge contained in Section 5(e) of the 2006 Refund Agreement (hereinafter the "Attachment Effective Period"), and further irrespective of whether or not the UPDPA remains valid and enforceable in its current form, the parties intend the following rebate crediting and reconciliation arrangement to apply and agree to the following related to prescription drug rebates received by Anthem BCBS on and after the effective date of this Attachment:

A. Reflected in the July 1, 2006 renewal is an estimate of $4,741,786, which represents the projected forecast of all prescription drug rebates to be received by Anthem BCBS or its affiliates for the contract year related to the claims associated with the Attachment and MEA Benefits Trust Group Agreement. This estimated rebate amount shall be reflected as a line item credit on the rating justification page that is included in the MEABT renewal package or its successor form. A corresponding administrative fee equivalent to $1,707,043, which represents 36% of the total estimated rebate amount, will be charged to MEABT in the renewal package.

B. Within nine months after the conclusion of the 2006 contract year, or such other period as the parties may mutually agree otherwise, Anthem BCBS shall prepare a reconciliation comparing the actual rebates earned for the contract year attributable to the MEA Benefits Trust Group Agreement to the estimated rebate credit included in the premium rating justification page for the contract year. A similar reconciliation will be made for each subsequent contract year if this Attachment continues in force as described in the first sentence of this Paragraph. The difference between the actual rebates earned and the estimated rebates, less administrative fees equivalent to 36% of the difference, will be added into the MEA Refund Agreement settlement for the contract year beginning 7/2007 and ending 6/2008, (or, if this Attachment continues in force, subsequent contract years) as follows:

$A - B = C$
$C * 64\% = D$

Where
$A$ = the actual rebates earned by Anthem BCBS and/or its affiliates for the contract year related to the claims associated with the MEA Benefits Trust Group Agreement
$B$ = the estimated rebates for the contract year reflected in the justification page of the renewal package or its successor form (as reflected in Paragraph 1(A) above)
$C$ = the difference between the actual and estimated rebates
$D$ = the difference between actual and estimated rebates, minus the 36% administrative fee. The amount reflected in D, whether positive or negative, will be added to the amount of the MEA Refund Agreement settlement for the contract year.

C. On an annual basis, Anthem BCBS shall provide information to an independent third party sufficient to verify the accuracy of the rebate calculations set forth in Paragraph 1(B) above. Anthem BCBS shall require the third party to provide the MEABT with a confirmation of the accuracy of the rebate calculation annually, within nine (9) months after the end of the contract year. Information produced or disclosed to the independent third party by Anthem BCBS and/or its affiliates is and shall remain confidential and not subject to review directly by the MEABT or any other person or entity other than the independent third party designated pursuant to this subsection.

D. The Parties acknowledge and agree that, prior to July 1, 2005, Anthem BCBS and/or its affiliates formerly received the prescription drug rebates related to the claims associated with the MEA Benefits Trust Group Agreement and the MEA Refund Agreement and passed these rebates back directly and indirectly to the MEABT through rebate payments, pharmacy services, and reduced premium in an amount greater than or equal to the value of the rebates received by Anthem BCBS and/or its affiliates.

2. For the Attachment Effective Period during which the UPDPA is and remains valid and enforceable, the provisions set forth in this Paragraph 2 shall govern the parties' respective rights and obligations under the UPDPA:

A. The parties acknowledge and agree that Anthem BCBS itself should not be considered a "pharmacy benefits manager", as that phrase is defined in the UPDPA, and should not be subject to the obligations set forth in the UPDPA, including without limitation the "Required Practices" set forth in 22 M.R.S.A. § 2699(2).

B. Notwithstanding the provisions set forth in Paragraph 2(A) above, if it is determined by a court, or other body with authority, that Anthem BCBS is a "pharmacy benefits manager" and/or is subject to the obligations set forth in the UPDPA, including without limitation the "Required Practices" set forth in 22 M.R.S.A. § 2699(2) then the parties, for themselves, their successors and assigns, acknowledge and agree as follows:

(i) The MEABT has received, in the form of rebate payments, pharmacy claims processing, pharmacy mail service, access to a national network of pharmacies, negotiated discounts on the cost of drugs, procurement of rebates, customer service and clinical and disease management programs, other benefits or consideration, or a combination thereof, the full benefit(s) or payment(s) received by Anthem BCBS or its affiliates, successors or assigns, related to the claims associated with and applicable to the Attachment and MEA Benefits Trust Group Agreement which are subject to UPDPA, including without limitation, the full benefit(s) or payment(s) based on either "prescription drug substitution", or on volume of sales as referenced in Sections 2699(2)(E)(3) & (F) of the UPDPA, respectively;

(ii) Any and all benefit(s) or payment(s) received by Anthem BCBS or its affiliates, successors or assigns prior to the effective date of this Attachment related to the claims associated with and applicable to the Attachment and MEA Benefits Trust Group Agreement which are subject to UPDPA, including without limitation any and all benefit(s) or payment(s) based on either prescription drug substitution or on volume of sales related to claims associated with and applicable to the Attachment and MEA Benefits Trust Group Agreement have been passed in full to the MEABT through the services referenced in Paragraph 2(B)(i);

(iii) Any and all benefit(s) or payment(s) received by Anthem BCBS or its affiliates, successors or assigns on or after the effective date of this Attachment related to the claims associated with and applicable to the Attachment and MEA Benefits Trust Group Agreement which are subject to UPDPA, including without limitation any and all benefit(s) or

payment(s) based on either prescription drug substitution or on volume of sales related to claims associated with and applicable to the MEABT, the Attachment, and MEA Benefits Trust Group Agreement shall be credited to the MEABT at the time and in the manner set forth in Paragraph 1(A) of this Attachment and offset in the manner set forth in Paragraphs 1(A) and 1(B) of this Attachment;

(iv) Any information required to be disclosed by Anthem BCBS or its affiliates, successors or assigns pursuant to the UPDPA, other than the information provided pursuant to Paragraph 1(C) of this Attachment, including without limitation the financial terms and arrangements referenced in Section 2699(2)(G), shall be provided by Anthem BCBS to an independent third party. Such information shall be provided by Anthem BCBS at a time and place mutually agreeable to Anthem BCBS and the designated third party, and not more frequently than annually. Information produced or disclosed to the independent third party is and shall remain confidential and not subject to review directly by the MEABT or any other person or entity other than the independent third party designated pursuant to this subsection; and

(v) The parties acknowledge and agree that this Attachment represents and constitutes good faith and complete compliance with the terms of the UPDPA.

C. If Anthem BCBS or its affiliates, successors or assigns, are required to comply with the UPDPA in whole or in part other than as set forth above in Paragraph 2, and notwithstanding any other provision of the Attachment to the contrary, the parties agree to negotiate in good faith an amendment to the Contract that returns the balance of the benefits and burdens under the Contract contemplated by the parties prior to the compulsion to comply with the UPDPA in whole or in part other than as set forth in Paragraph 2. In the event that the parties are unable to negotiate a mutually acceptable amendment to the Contract, then the parties agree to submit the matter for binding arbitration by a single arbitrator to be mutually agreed upon by the parties. The purpose of the arbitration shall be to determine whether, and, if so, how, the Contract can be amended to return the balance of the benefits and burdens under the Contract contemplated by the parties prior to the compulsion to comply with the UPDPA in whole or in part other than as set forth in Paragraph 2.

3. The MEABT for itself, its successors and assigns agrees not to initiate, join or cooperate in any lawsuit or other action that would be contrary to this Attachment or the provisions hereof. The MEABT further acknowledges and agrees that there would be no adequate remedy at law for the breach of this provision of the Attachment, and, accordingly, if breached, injunctive relief enforcing compliance would be necessary and appropriate. This provision shall survive the termination of this Attachment.

4. Failure to enforce any provision(s) of this Attachment shall not have any affect on the enforceability of any other provision(s) of this Attachment. No waiver of any provision of this Attachment or departure from any term of this Attachment shall be effective unless in writing and signed by the parties.

5. In the event that any of the terms, covenants or conditions of this Attachment, or the application of any such term, covenant or condition, shall be held invalid, all other terms, covenants or conditions of this Attachment and their application shall not be affected thereby.

IN WITNESS WHEREOF, the MEABT and Anthem BCBS have caused this Attachment to be executed by their duly authorized representatives as of the date first above written.

ANTHEM BCBS

By: _____
Name: ERIC HOEPFINGER
Title: PRESIDENT

MEABT

By: _____
Name: Robert D. Gibbons
Title: Executive Director