UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MAINE EDUCATION ASSOCIATION BENEFITS TRUST et al., <br><br> Plaintiffs, <br><br> v. <br><br> ERIC CIOPPA, in his official capacity as SUPERINTENDENT OF INSURANCE OF THE STATE OF MAINE, <br><br> Defendant. | ) ) ) ) ) ) Docket no. 1:11-cv-381-GZS ) ) ) ) ) ) ) ) ) |

**ORDER ON MOTION TO DISMISS**

Before the Court is Defendant's Partial Motion to Dismiss (Docket # 30). For the reasons explained herein, the Court GRANTS the Motion.

**I.   LEGAL STANDARD**

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the "legal sufficiency" of a complaint. Gomes v. Univ. of Me. Sys., 304 F. Supp. 2d 117, 120 (D. Me. 2004). The general rules of pleading require a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement need only "give the defendant fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007) (internal quotations and alteration omitted).

However, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

1

possibility that a defendant has acted unlawfully." Id. (internal quotation omitted). Thus, faced with a motion to dismiss, the Court must examine the factual content of the complaint and determine whether those facts support a reasonable inference "that the defendant is liable for the misconduct alleged." Id. In conducting this examination of the complaint, the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. Gargano v. Liberty Intern. Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009). However, the Court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949. In distinguishing sufficient from insufficient pleadings, which is a "context-specific task," the Court must "draw on its judicial experience and common sense." Id. at 1950 (internal citation omitted).

## II. BACKGROUND

Plaintiff Maine Education Association Benefits Trust ("MEABT" or the "Trust") was formed in 1993. The Maine Education Association ("MEA") is the settlor of the Trust and the Trust furthers MEA's organizational principle and goals. MEABT is governed by a nine member board of trustees, all of whom are current or retired Maine public school employees.[1] Since its inception, MEABT has made group health insurance available to employees of Maine's public school districts. In addition to public school employees, the MEABT plan covers employees of several private secondary schools that were "grandfathered" in 1993 as well as employees of MEABT and MEA. MEABT qualifies as a voluntary employees' beneficiary association ("VEBA") pursuant to Section 501(c)(9) of the Internal Revenue Code.

---

[1] Each of the trustees is separately named as a plaintiff in this action.

### A. The MEABT Plan

MEABT insures participating employees by purchasing an insurance policy from Anthem, a state regulated insurance company. The current contract between Anthem and MEABT was executed by Anthem on August 9, 2011 and by MEABT on August 24, 2011 (the "Contract"). The Contract is effective from July 1, 2011 through June 30, 2012. (See Compl. Ex. 2 (Docket # 1-2).)[2] As the plan sponsor and group policy holder of the Contract, MEABT provides health coverage to approximately 65,000 individuals, including employees in approximately 99 percent of Maine public schools. However, MEABT has no contracts with any school district or other educational institutions and such institutions and districts do not act as sponsors or participants in the MEABT health plan. Eligibility for enrollment in the MEABT health plan is determined by individual collective bargaining agreements negotiated between local bargaining units and the school districts or other education institutions. If the bargaining unit has negotiated the right to enroll in the MEABT health insurance plan, individual employees enroll in the plan directly with the insurer—currently, Anthem.

Because of the size of the membership pool, MEABT is able to minimize administrative costs and spread the costs of large claims over the group thereby resisting fluctuations in premiums. In furtherance of its cost spreading goals, the MEABT plan is "community-rated" meaning the coverage is priced "based on the total utilization costs for the entire group statewide, without geographic variation or the consideration of individual employers' demographic mix, prior utilization or loss experience." (Am. Compl. (Docket # 23) ¶ 23.) MEABT's trustees decided in an exercise of their fiduciary duties to provide insurance coverage on a statewide

---

[2] Plaintiffs attached the Contract and certain other exhibits to their initial Complaint (Docket # 1). To the extent that the Amended Complaint references those same exhibits, the Court has reviewed and considered them in connection with the pending Motion. See Trans-Spec Truck Service, Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008) (explaining the circumstances in which a court may properly consider exhibits attached to a complaint and other matters outside the pleadings when deciding a motion to dismiss).

community-rated basis with the understanding that participants who are actuarially better risks would help subsidize the premiums paid by other members who are actuarially less attractive to insurers and the goal of ensuring that the entire group would have access to reasonably affordable health insurance. The Trustees' decision to charge one statewide rate for each benefit package is a central part of the plan's design and well-known by participants and employers.

The alternative to MEABT's "community-rated" insurance would be "experience-rated" group health insurance – that is, group health insurance coverage rated and priced based on the loss experience of an individual district or other education institution. In general, for a variety of reasons, health care costs and health insurance premium rates in Northern and Eastern Maine are greater, on average, than the costs and premium rates in Southern Maine. As a result, "experience rated" group health insurance would typically be more expensive for a school district in Northern or Eastern Maine than it would be for one in Southern Maine.

### B. MEABT's Position on Loss Information

As defined in Maine statute, "loss information" includes "the amount of premium received, the amount of claims paid and the loss ration" but excludes "any information or data pertaining to medical diagnosis, treatment or health status that identifies an individual covered under the group contract or policy." 24-A M.R.S.A § 2803-A.

Under the MEABT Trust Agreement, the Trustees have "absolute discretion and authority to make all fiduciary decisions, plan provision interpretations and constructions and other determinations under this Trust and any plans maintained under the Trust . . . including without limitation, decisions relating to the use and dissemination (if any) of the participant claims experience data under any plan maintained by the Trust." (Am. Compl. ¶ 85.)

4

Over the years, various school districts have requested loss information and claims experience data for their district from the Trust. The Trust has responded to each request by indicating that it does not calculate or release loss information for districts or other groups within the Trust. (See Am. Compl. ¶ 34.) MEABT has deliberating decided that "organizing the experience and claims history date by [district] would undermine the Trust's ability to charge one statewide rate for insurance coverage." (Am. Compl. ¶ 36.) As a result, MEABT has always negotiated with its insurer that "loss experience and claims histories for individual employers would not be revealed to anyone, whether outside or inside of Anthem or its predecessors' organizations, without express permission of MEABT." (Am. Compl. ¶ 37.) The current Contract between MEABT and Anthem specifically states:

> All experience data relative to the MEABT and its subgroups is owned by the Trust, and that data will not be released, either directly or indirectly, by Anthem without the prior written consent of the Trust, and the Trust can withhold its permission for any reason it deems appropriate. Additionally, Anthem agrees not to utilize data relating to specific active subgroups for standalone rating purposes.

(Contract (Docket # 1-2) at 5.) MEABT avers that an identical provision has appeared in each contract since 2005. Pursuant to this provision, MEABT and Anthem consider the loss information and claims history of individual districts to be the confidential property of the Trust and a trade secret owned by the Trust. As an asset of the Trust, the Trustees are obligated to manage this information for the sole benefit of the beneficiaries and plan participants.

### C.  LD 1326

In this case, MEABT seeks to challenge sections of the State of Maine's L.D. 1326, "An Act to Allow School Administrative Units to Seek Less Expensive Health Insurance Alternatives" (hereinafter "LD 1326"). LD 1326 was passed by the Maine Legislature on June 16, 2011, signed into law on June 21, 2011, and became effective on October 1, 2011. In this

case, MEABT seeks to challenge the portions of that state law that are codified at 20-A M.R.S.A. § 1001(14)(D) and 24-A M.R.S.A. § 2803-A(2).

>As amended 20-A M.R.S.A. § 1001(14)(D) reads:
>
>**Insurance purchase by competitive bidding** . . . .
>
>**D.** In order to facilitate the competitive bidding process in procuring health insurance for a school administrative unit's employees under this subsection, the administrator for an individual school plan or for a group plan for a multiple-school group shall seek and obtain competitive bids through a request for proposal process from qualified insurers at least once every 5 years commencing July 1, 2012. The administrator for any such group plan shall make the request for proposal responses available to requesting school administrative units, excluding any portions of the request for proposal responses considered to be confidential proprietary information by the submitting insurers. If any such individual school plan or group plan is subsequently self-insured, in whole or in part, the school board shall compare the overall cost of such a self-insured plan, including projected claims, all administrative expenses and reinsurance expenses, to the cost of insured products at least once every 5 years commencing July 1, 2012.

Id.

>As amended 24-A M.R.S.A . § 2803-A(2) reads:
>
>**Disclosure of basic loss information.** Upon written request, every insurer shall provide loss information concerning a group policy or contract to its policyholder, to a former policyholder or to a school administrative unit pursuant to Title 20-A, section 1001, subsection 14, paragraph E within 21 business days of the date of the request. This subsection does not apply to a former policyholder whose coverage terminated more than 18 months prior to the date of a request.

Id.  Together, these statutory sections allow school districts to obtain their own aggregate loss information from health insurers and essentially mandate that school districts use this information to obtain competitive bids for employee health insurance every five years. Ultimately, the Trust anticipates that LD 1326 will result in the withdrawal of districts with favorable loss experience from the MEABT thereby shrinking the number of participants in the pool and eliminating the economic advantage MEABT currently secures for its plan participants.

On October 6, 2011, Regional School Unit # 23 invoked the new disclosure rules and wrote to Anthem requesting disclosure of the loss information for its own school administrative unit. (See Ltr. from Sharon LaFlamme (Docket # 1-3).)

### D. Procedural History

In response to districts seeking to invoke the new state law, MEABT filed this action on October 12, 2011 naming Eric Cioppa, the Superintendent of Insurance of the State of Maine, as Defendant. The Amended Complaint (Docket # 23) asserts that LD 1326 should be declared invalid on multiple bases. Count I asserts that the provisions are preempted by the Employee Retirement Income Security Action ("ERISA"), 29 U.S.C. § 1144(a). Count II claims that the LD 1326 amounts to an unlawful taking under both the Fifth Amendment of Unites States Constitution and the analogous provision of the Maine Constitution. Count III alleges a deprivation of property without due process in violation of the United States Constitution and the Maine Constitution. Count IV alleges that the state statutes create an impairment of contract in violation of the Contract Clauses of both the United States and Maine Constitutions. Count V asserts a claim under 42 U.S.C. § 1983 based on the previously asserted constitutional violations.

In connection with the Complaint, Plaintiffs moved for preliminary injunctive relief. Defendant agreed to hold off on any enforcement of the newly-enacted statute pending the resolution of the initial round of motion practice. (See Oct. 24, 2011 Report (Docket # 20) at 1.) Defendant then filed the pending motion to dismiss in connection with responding to the still pending motion for preliminary injunction, which is the subject of a separate order.

### III. DISCUSSION

Defendant has moved to dismiss three counts of Plaintiffs' five-count Amended Complaint. Specifically, Defendant argues that Plaintiffs fail to state a claim for ERISA preemption (Count I), violation of the constitutional right to due process (Count III) and impairment of contract (Count IV). The Court considers each of these claims in turn.

#### A. Count I: ERISA Preemption

Plaintiffs invoke two different types of ERISA preemption: express preemption and conflict preemption.

##### 1. Express Preemption

While ERISA expressly preempts state laws to the extent that they "relate to any employee benefit plan" governed by ERISA, ERISA also contains a "savings clause" which exempts from preemption "any law of any State which regulates insurance." 29 U.S.C. § 1144 (a) & (b)(2)(A). In Kentucky Association of Health Plans v. Miller, 538 U.S. 329 (2003), the Supreme Court held that state laws fall within this savings clause if (1) the law is specifically directed at insurers and insurance practices and (2) the state law "substantially affect[s] the risk pooling arrangement between insurer and insured." Id. at 338; see also Fossen v. Blue Cross & Blue Shield of Montana, Inc., 660 F.3d 1102, 1108 (9th Cir. 2011) (applying the Miller test). The state laws that serve as the basis for Plaintiffs' claims regulate to whom every insurer must disclose basic loss information. As a result, the law regulates the practices of insurers and aims to substantially affect the risk pooling arrangement between insurers and school districts. Ultimately, LD 1326 alters the "scope of permissible bargains" that an insurer can offer any

entity that insures multiple school districts.[3]  Miller, 538 U.S. 338-39.  In short, the Court is satisfied that LD 1326 is saved from express preemption under ERISA.

Plaintiffs argue that LD 1326 does not meet Miller's requirement of a *substantial effect* on the risk pooling arrangement between insurer and insured.  Instead, Plaintiffs assert that LD 1326 is significantly different from other cases cited by Defendants that found state laws saved from preemption under the two-prong Miller test.  Plaintiffs invite the Court to reach the same result reached by the Third Circuit in Barber v. Unum Life Ins. Co., 383 F.3d 134 (3d Cir. 2004), which found that a Pennsylvania statute allowing for an award of punitive damages when an insurer is found to act in bad faith did "not affect the kinds of bargains insurers and insureds may make." Id. at 143.  The Third Circuit reached this conclusion because "the bad faith statute [at issue was] remedial in nature" supplying "a remedy to which the insured may turn when injured by the bad faith of an insurer." Id.  Barber is inapposite.  LD 1326 is not remedial in nature.

While neither the parties nor this Court have found a previously reported case holding that ERISA's savings provision applies to a state law similar to LD 1326, this lack of on-point precedent does not prevent the Court from finding that Plaintiffs have failed to state a claim for express preemption under ERISA.  The fact remains that Maine has regulated the disclosure of loss information by insurers for many years.  See 1995 Me. Laws, ch. 71 § 2 (codified as amended at 24-A M.R.S.A. § 2803-A).  As Defendant indicates in his Motion to Dismiss, LD 1326 was designed to address a "loophole" in section 2803-A and thereby protect school districts that participate in any permissible insurance arrangement, including MEABT, in which "the district is technically not the policyholder." (Def. Mot. (Docket # 30) at 5.)  Plaintiffs have not argued that by amending section 2803-A and closing this loophole, Maine somehow crossed over

---

[3] Specifically, an insurer required to comply with 24-A M.R.S.A. § 2803-A would not be able to offer MEABT or any other group of school districts an agreement containing the language found of Section 5 of the current Contract. (See Contract (Docket # 1-2) at 5.)

into express ERISA preemption. Rather, taken to its logical conclusion, Plaintiffs' argument would have this Court find that Maine cannot require its licensed insurers to disclose loss information on any plan subject to ERISA. The Court believes regulating when and how insurers must disclose loss information is "classic insurance regulation" that undeniably has a substantial effect on risk pooling. Spellman v. United Parcel Service, Inc., 540 F. Supp. 2d 237, 247 (D. Me. 2008).

### 2. Conflict Preemption

The Court next considers whether LD 1326 is subject to conflict preemption. Under the doctrine of conflict preemption a state law is preempted if "it actually conflicts with federal law" thereby making "compliance with both state and federal law . . . impossible" or "when the state law stands as an obstacle to the accomplishment and execution of the full purposes of Congress." Fitzgerald v. Harris, 549 F.3d 46, 53 (1st Cir. 2008) (internal quotations omitted).

Plaintiffs argue that LD 1326 conflicts with 29 U.S.C. § 1182, which essentially prohibits a group health plan from creating eligibility rules for plan participants that are based on a variety of "health status-related factors," including medical conditions, claims experience, medical history, genetic information or disability. See 29 U.S.C. § 1182(a)(1). Section 1182 was enacted as part of the Health Insurance Portability and Accountability Act ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996).[4] Section 1182 aims to prohibit premium discrimination between

---

[4] Congress included a specific section with respect to preemption of state law that applies to Section 1182. 29 U.S.C. § 1191(a) reads:

**Continued applicability of State law with respect to health insurance issuers**
(1) In general

Subject to paragraph (2) and except as provided in subsection (b) of this section, this part shall not be construed to supersede any provision of State law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement of this part.

individuals in the same risk pool based on health status-related factors.[5] Nothing in LD 1326 conflicts with this prohibition. It is readily apparent that the MEABT plan can simultaneously comply with 29 U.S.C. § 1182 and 24-A M.R.S.A. § 2803-A.

However, Plaintiffs argue that "giving effect to [LD 1326] will pose an 'obstacle' to achieving the essential policy the federal law was enacted to promote." (Pls. Response at 5.) Specifically, Plaintiffs argue that the purpose of LD 1326 "is to create the conditions that will facilitate fragmentation of the statewide community-rated pool" but that MEABT's community-rated plan actually increases access to affordable group health insurance to individuals, some of whom have the health status-related factors targeted in Section 1182. (Id.) The fact remains that even if the large MEABT pool is fragmented as a result of LD 1326, those smaller groups will still be required to comply with 29 U.S.C. § 1182, as well as the identical Maine legislation. See 24-A M.R.S.A. § 2850-C. Thus, individuals with health status-related factors will still receive the same protection. Ultimately, Section 1182 and HIPAA do not have as their purpose the creation of statewide risk pools or risk pools of any particular size. Plaintiffs may well be correct that it is easier or more cost efficient to insure individuals protected by Section 1182 in a large, statewide risk pool. However, Congress did not mandate how group health plans maximize compliance with Section 1182. Rather, Congress simply prohibited group health plans from discriminating against individual participants and beneficiaries based on health status. Under

---

> (2) Continued preemption with respect to group health plans
>
> Nothing in this part shall be construed to affect or modify the provisions of section 1144 of this title with respect to group health plans.

29 U.S.C. § 1191(a). While Defendant argues that Section 1191(a) is "fatal to the Trust's argument," (Def. Mot. at 11.) the Court does not believe that this express HIPAA-specific preemption clause forecloses any and all arguments regarding conflict preemption related to 29 U.S.C. § 1182(a)(1).

[5]Persons with the factors listed in Section 1182 generally incur more health-related expenses and, thus, have more health insurance claims. Thus, health status related factors are usually reflected in loss information.

these circumstances, Plaintiffs cannot state a claim that LD 1326 is subject to conflict preemption.

Therefore, the Court concludes that Plaintiffs have failed to state a claim for ERISA preemption and Defendant is entitled to the dismissal of Count I.

### B. Count III: Due Process

The Trust's due process claim presents a substantive due process challenge. (See Am. Compl. ¶ 79.) In responding to Defendant's Motion to Dismiss, Plaintiffs readily acknowledge that "the battle of anyone challenging a statute of due process grounds is an uphill one." (Pls. Response (Docket # 45) at 18.) Nonetheless, Plaintiffs assert that the facts alleged in their Amended Complaint "augmented by the evidence before the Court in connection with Plaintiffs' Motion for Preliminary Injunction, suffices to state a claim upon which relief can be granted."[6] (Id.)

As a legislative act that "adjust[s] the burdens and benefits of economic life," LD 1326 is entitled to a "presumption of constitutionality." Concrete Pipe and Prods. of Cal. v. Constr. Laborers, 508 U.S. 602, 637 (1993) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15 (1976)). To overcome that presumption and succeed in a substantive due process challenge, the Trust ultimately bears the burden of demonstrating "that the legislature has acted in an arbitrary and irrational way." Id. Challenges to economic legislation in particular are subject to a "deferential standard of review"; "there is no need for mathematical precision in the fit between

---

[6] The Court notes that if it were to accept Plaintiffs' invitation to "augment" the record to include all of the materials submitted in connection with the Motion for Preliminary Injunction, it would be required to convert the Motion to Dismiss to a motion for summary judgment in accordance with Federal Rule of Civil Procedure 12(d). See Trans-Spec Truck Service, Inc., 524 F.3d at 321. In an exercise of its discretion, the Court has decided the pending motion under the Rule 12(b)(6) standard and not considered the "augmented" record. However, the Court notes that, in its opinion, the same result would be obtained if the Court considered the augmented record and applied the Rule 56 standard.

justification and means." Id. at 639. If "any reasonably conceivable set of facts could establish a rational relationship between [the challenged provisions] and the . . . government's legitimate ends," the legislation is valid. Tenoco Oil Co., Inc. v. Dep't of Consumer Affairs, 876 F.2d 1013, 1021 (1st Cir. 1989); see also Nat'l Educ. Ass'n—R.I. v. Ret. Bd. of R.I. Employees' Ret. Sys., 172 F.3d 22, 30 (1st Cir. 1999) ("the due process standard in economic matters is one of minimum rationality").

Quite simply, Plaintiffs' Amended Complaint does not state a plausible claim that LD 1326 is arbitrary and irrational and thereby violates substantive due process. Even if Plaintiffs could prove, as argued in their Response, that the legislative debate on LD 1326 included "false and incendiary" statements and that the proponents of LD 1326 were "cavalierly uninformed" and/or politically motivated, LD 1326 still reflects a rational approach to insurance regulation and regulation of public school districts. As Defendant points out in the Motion to Dismiss, MEABT's case is "premised on the notion" that by allowing school districts access to loss information LD 1326 will provide them the information to shop for and perhaps choose other less expensive health insurance choices for covering employees. (Def. Mot. at 20.) In short, rational people could believe (as MEABT apparently does) that LD 1326 will lead to some school districts exploring and ultimately choosing health insurance plans that are cheaper than the MEABT plan. Because LD 1326 passes the necessary threshold for minimal rationality, the Court concludes that Defendant Cioppa is entitled to dismissal of Count III.

### C. Count IV: Impairment of Contract

The Constitution provides that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts." U.S. Const. art. 1, §10, cl. 1. "Though seemingly absolute in its prohibition, the Contracts Clause 'must be accommodated to the inherent police power of the

State to safeguard the vital interest of its people.'" Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 42 (1st Cir. 2005) (quoting Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410 (1983) (additional internal quotations omitted). To find that a state law violates the Contract Clause, the Court must find: (1) a contractual relationship, (2) that the "change in law impairs that contractual relationship," and (3) that the impairment is substantial. Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, 125 F.3d 9, 13 (1st Cir. 1997); see also United Auto., Aerospace, Agricultural Workers of Am. Int'l Union v. Fortuno, 633 F.3d 37, 41 & n.4 (1st Cir. 2011) (noting the "differing characterizations" of the Contract Clause analysis). Whether an impairment is substantial requires the Court to consider "the expectations of the parties to the alleged contract." Mercado-Boneta, 125 F.3d at 13. However, those expectations are necessarily adjusted when the parties are "operating in a heavily regulated industry," such as insurance, when the parties can "readily foresee future regulation involving the subject matter of their contract." Id. at 13-14. Overall, "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 245 (1978). Ultimately, "even a state law that creates a substantial impairment does not transgress the Contract Clause as long as it is appropriate for, and necessary to, the accomplishment of a legitimate public purpose." Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 191 (1st Cir. 1999); see also Energy Reserves Group, Inc. v. Kansas Power and Light Co., 459 U.S. 400, 412 (1983) ("The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests."). In fact, "when the contracts at issue are private and no appreciable danger exists that the governmental entity is using its regulatory

power to profiteer or otherwise serve its own pecuniary interests," the Court "may defer to the legislature's judgment" and need not assess the reasonableness or necessity of the impairing regulation. See Houlton Citizens Coalition, 175 F.3d at 191.

MEABT argues that LD 1326 impairs its Contract with Anthem, its Trust Agreement and the collective bargaining agreements between the Trust's beneficiaries and the employers of those beneficiaries. The Court considers each of those contracts in light of the Contract Clause analysis just described.

### 1. The Contract with Anthem

As to the Contract between Anthem and MEABT, there is no constitutionally cognizable impairment. In Texaco, Inc. v. Short, 454 U.S. 516 (1982), the Supreme Court explained that a "statute cannot be said to impair a contract that did not exist at the time of its enactment." Id. at 531. To the extent that Plaintiffs' Amended Complaint avers that LD 1326, which was enacted on June 21, 2011, impairs the Contract that was signed between MEABT and Anthem in August 2011 and became effective on July 1, 2011, such a claim fails as a matter of law under Texaco.

The Court declines to read the Amended Complaint as actually including an allegation that MEABT is also alleging impairment of its earlier "essentially identical" contracts with Anthem. (Pls. Reply to Mot. for Prelim. Injunction (Docket # 43) at 16.) First, it is clear that the Amended Complaint focuses its impairment allegations on the current contract with Anthem. None of the prior contracts are attached or explicitly referenced. Moreover, the current Contract expressly "supersedes" all prior contracts between MEABT and Anthem. Thus, it would appear that the current Contract would render the prior contracts moot to the extent that those contracts contained similar provisions regarding the ownership and disclosure of loss information. Rather, Anthem clearly would rely on the current Contract in declining a request for disclosure of loss information, even if that information related to pre-July 2011 claims.

15

### 2. The Trust Agreement

Plaintiffs next argue that LD 1326 impairs the absolute discretion afforded to the Trustees to "make decisions relating to the use and dissemination of . . . any participant claims experience data under any plan maintained under the Trust." (Am. Compl.¶ 85.) In the Court's assessment, LD 1326 does not work a substantial impairment on the Trust Agreement or the discretion afforded the Trustees under the Agreement. First, Plaintiffs' expectations as to their ability to absolutely control dissemination of loss information is necessarily adjusted downward because insurance is heavily regulated and the Trust's loss information is compiled by an insurance company subject to such regulation. Second, viewing LD 1326 in the context of the entire Trust Agreement, the Court concludes that any impairment of the Agreement is minimal. The Trustees still maintain their absolute discretion on a wide variety of other issues. Additionally, the Trustees may continue to exercise their discretion with respect to how the Trust itself uses or disseminates loss information. What the Trustees have lost–albeit indirectly–is the discretion to prohibit its state regulated insurer from releasing loss information to school districts. Third, assuming for the sake of argument that the impairment was more severe, the Court will still conclude that LD 1326 serves a legitimate public purpose–namely, allowing school districts to "arrange for and offer a choice of optional health . . . insurance plans to employees and their families that may vary in benefits provided and costs".[7] (LD 1326 Summary (Docket # 30-1) at PageID 9.) In short, for multiple reasons, the Court concludes that Plaintiffs cannot state a plausible claim that LD 1326 impairs the Trust Agreement in violation of the Contract Clause.

---

[7] Because the Agreement between Anthem and MEABT is private, there is "no appreciable danger" that the State of Maine enacted LD 1326 "to profiteer or otherwise serve its own pecuniary interest." Houlton Citizens Coalition, 175 F.3d at 191. Under these circumstances, the Court need not proceed to reasonableness and necessity.

### 3. The Collective Bargaining Agreements

In the Amended Complaint, Plaintiffs also allege that LD 1326 "substantially impair[s] the contract rights of MEABT's enrollees who have purchased health insurance through the MEABT understanding and relying on its statewide community-rated design, and their employers, who have collectively bargained to contribute to its cost, by effectively eliminating that feature of their respective contracts." (Am. Compl. ¶ 86.)

First and foremost, the Court does not believe that Plaintiffs have standing to assert an impairment claim when Plaintiffs themselves are not parties to the contracts in question. See Mercado-Boneta, 125 F.3d at 12 n.5; see also Eulitt ex rel. Eulitt v. Maine Dep't of Educ., 386 F.3d 344, 351 (1st Cir. 2004) (explaining the requirements for third party standing). These contracts are between school districts, as employers, and local bargaining units acting on behalf of employees. Plaintiffs have made no adequate showing that the district and local unions face an obstacle that prevents them from bringing their own claims.[8] See Eulitt, 386 F.3d at 351-54.

Assuming for the moment that Plaintiffs had standing, the claim that LD 1326 substantially impairs an undisclosed number of existing collective bargaining agreements is implausible on the face of the Amended Complaint. LD 1326 does not eliminate the MEABT plan, nor does it require MEABT to change the design of its plan. Nonetheless, because of the regulated nature of the insurance industry, the parties to those collective bargaining agreements should readily expect that changes in insurance regulation may change the nature of the health insurance benefits as well as the cost of those benefits in coming years. In fact, Plaintiffs' Response highlights some other legislative changes that are set to take effect in coming years.

---

[8] The Court notes that at least four school districts have intervened as Defendants in this matter and now assert the position that LD 1326 does not impair their respective collective bargaining agreements. (See Intervenor Defs. Reply (Docket # 53) at 6.)

(See Pls. Response (Docket # 45) at 14-15 (discussing the Patient Protection and Affordable Care Act).) In short, it is implausible for Plaintiffs to generally aver that the employers and employees who are parties to the collective bargaining agreements do not foresee that changes in health insurance regulation may impact the insurance available to them in the years ahead.

Even if Plaintiffs could pass over the substantial impairment hurdle, the Court would still find that LD 1326 serves the legitimate public purpose already described and that Maine is entitled to have this Court defer to its legislative judgment that LD 1326 is a necessary and reasonable mechanism for achieving that important purpose.[9]  Therefore, the Court concludes that the Amended Complaint fails to state any plausible claim for violation of the Contract Clause and dismisses Count IV.

## IV.  CONCLUSION

For the reasons just given, Defendant's Motion to Dismiss is hereby GRANTED and Counts I, III & IV are hereby DISMISSED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 3rd day of February, 2012.

---

[9] Because the Court defers to the judgment of the Maine Legislature in choosing the mechanism for increasing the benefit options school district can offer employees, it does not address Plaintiff's multiple allegations that LD 1326 lacks the requisite reasonableness and necessity.  (See Pls. Response at 11-16.)