UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MAINE EDUCATION ASSOCIATION BENEFITS TRUST et al., | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| | ) Docket no. 1:11-cv-381-GZS |
| v. | )<br>) |
| ERIC CIOPPA, in his official capacity as SUPERINTENDENT OF INSURANCE OF THE STATE OF MAINE, | )<br>)<br>)<br>)<br>) |
| Defendant. | ) |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs' Motion for Preliminary Injunction (Docket # 13). For the reasons explained herein, the Court DENIES the Motion.

**I.  LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

Plaintiffs, as the moving party, bear the burden of persuasion to show: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Iantosca v. Step Plan Servs., Inc., 604 F.3d 24, 29 n.5 (1st Cir. 2010) (citation omitted). Likelihood of success on the merits is the "most important part of the preliminary injunction assessment." Jean v. Mass. State Police, 492 F.3d 24, 27 (1st Cir. 2007). Even if likelihood of success is low, a court might consider injunctive relief based on a very significant showing of irreparable harm. See Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001) (explaining that the preliminary injunction "process involves engaging in . . . the

sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position"). However, a showing of irreparable harm must be "grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II v. Blinds to Go, 370 F.3d 151, 162 (1st Cir. 2004). Ultimately, the Court must "bear constantly in mind that an '[i]njunction is an equitable remedy which should not be lightly indulged in, but used sparingly and only in a clear and plain case.'" Saco Def. Sys. Div., Maremont Corp. v. Weinberger, 606 F. Supp. 446, 450 (D. Me. 1985) (quoting Plain Dealer Pub. Co. v. Cleveland Typographical Union No. 53, 520 F.2d 1220, 1230 (6th Cir.1975)).

## II. PROCEDURAL BACKGROUND

Plaintiff Maine Education Association Benefits Trust ("MEABT" or the "Trust") originally invoked three counts of its Amended Complaint (Docket # 23) in support of its request for a preliminary injunction: (1) ERISA Preemption (Count I); (2) Unlawful Taking (Count II) and (3) Impairment of Contract (Count IV). In responding to Plaintiffs' Motion for Preliminary Injunction, Defendant sought, by separate motion, to dismiss the ERISA Preemption claim and the Impairment of Contract claim. By separate order, the Court has determined that these claims, along with Count III, fail to state a claim and are subject to dismissal.

In light of that ruling, only Count II remains as a basis for the Motion for Preliminary Injunction.[1] Thus, the Court necessarily limits its consideration of the Motion for Preliminary Injunction to the Unlawful Taking claim. In laying out the factual background, the Court does not repeat all of the factual background contained in its Order on the Motion to Dismiss. Rather,

---
[1] Alternatively, for all of the reasons stated in the Court's Order on Motion to Dismiss, the Court would find that Plaintiffs do not possess the requisite likelihood of success on Counts I and IV to support a preliminary injunction.

2

the Court focuses its factual discussion on the supplementary factual record filed in connection with the Motion for Preliminary Injunction to the extent that the record contains facts that are relevant to Count II.

## III. FACTUAL BACKGROUND

### A. MEABT & Its Health Insurance Plan

MEABT currently covers approximately 67,000 members (school employees and dependents) in an insured plan underwritten by Anthem Blue Cross Blue Shield of Maine ("Anthem"). There are about 180 school districts of varying size which provide insurance through the MEABT program. (DeWeese Decl. (Docket # 15) ¶ 4.) All told, the Trust insures employees in 99 percent of Maine's school districts. (Diamond Decl. (Docket # 26) ¶ 5.) Eligibility for enrollment in the MEABT health insurance plan is determined by the collective bargaining agreements negotiated between local bargaining units and individual employers, predominantly school districts. The employees of an individual school district are eligible to participate in the MEABT plan if the largest collective bargaining unit in that school district is represented by the Maine Education Association ("MEA"). Once eligibility has been established, the school board and the employees decide together, by a collaborative vote, whether the employees will be offered the MEABT plan. Employees in bargaining units which have negotiated the right to enroll in the MEABT health insurance plan and who wish to become enrolled in the plan enroll directly with the plan's insurer, Anthem. MEABT has no contracts with any individual educational institution, and those institutions are not considered to be sponsors of the plan. (Burke Decl. (Docket # 18) ¶¶ 14 & 15.) Rather, based on the district's

collective bargaining agreements, different school districts subsidize portions of the cost of health insurance for employees and their dependents at different rates.[2] (Burke Decl. ¶ 18.)

Since the MEABT's inception, the insurance coverage it has made available to the employees of educational institutions has been "community-rated." That is, all negotiations for insurance coverage have been conducted with the express understanding that it would be priced on the basis of the total utilization costs for the entire group state-wide, without geographic variation or the consideration of individual employers' demographic mix, prior utilization, or loss experience. (Burke Decl. ¶ 12.) The community-rated design of the MEABT plan has been widely known throughout the State of Maine for many years. (Burke Decl. ¶ 17.)

The decision to provide insurance coverage on a statewide, community-rated basis was a decision made by the Trustees in the exercise of their fiduciary responsibilities under the Trust, with the understanding that members of the statewide group who are actuarially better risks would help subsidize the premiums paid by other members who are actuarially less attractive to insurers. (Burke Decl. ¶ 12.) The community-rated plan design is intended to economically benefit employees of educational institutions in the State of Maine whose work forces are on average older and less healthy than other members of the group, and who reside in regions with higher health care costs. The MEABT regards this benefit as especially important since school employees in these areas—typically Northern and Eastern Maine—earn on average substantially less than their counterparts in Southern Maine. Thus, the design of the plan is intended, in part, to help mitigate that disparity. (Burke Decl. ¶ 13.)

---

[2] School districts do not subsidize any portion of the cost of health insurance for their retirees. Instead, the State of Maine subsidizes up to 45 percent of the premiums for the 10,000 school district retirees who currently participate in the MEABT plan. (Burke Decl. ¶ 18.)

On average, over the last four years, the loss ratio reported by Anthem's MEABT plan has been 90.8 percent after premium refunds.[3] (DeWeese Decl. ¶ 7.) This loss ratio reflects lower than average administrative costs that MEABT accesses because of its current size. (DeWeese Decl. ¶ 11.) For the most recent plan year, the annual premium for the Anthem plan purchased by MEABT was approximately $370,000,000, which equals an average cost of approximately $460 per member per month ("PMPM"). (DeWeese Decl. ¶ 4.) The Trust itself maintains a reserve fund that according to its last available audit held in excess of $87 million dollars. (2010 MEABT Audit (Docket # 29-4) at Page ID 533; Diamond Decl. ¶ 6.) The reserve fund contains the premium refunds received from Anthem. The Trust uses these funds to buy down rate increases, thereby further avoiding increases in the PMPM cost charged to participants. (Diamond Decl. ¶ 6.)

**B.     LD 1326**

In this case, MEABT seeks to challenge sections of the State of Maine's L.D. 1326, "An Act to Allow School Administrative Units to Seek Less Expensive Health Insurance Alternatives" (hereinafter "LD 1326"). LD 1326 was passed by the Maine Legislature on June 16, 2011, signed into law on June 21, 2011 and became effective on October 1, 2011. In this case, MEABT seeks to challenge the portions of that state law that are codified at 20-A M.R.S.A. § 1001(14)(D) and 24-A M.R.S.A. § 2803-A(2).

As amended 20-A M.R.S.A. § 1001(14)(D) reads:

> **Insurance purchase by competitive bidding** . . . .
>
> **D.** In order to facilitate the competitive bidding process in procuring health insurance for a school administrative unit's employees under this subsection, the administrator

---

[3] Loss ratio is the ratio obtained by dividing the total claims for medical expense by the premiums net of premium refunds. A loss ratio of 90.8 percent means that the administrative costs, taxes and profits represent the remaining 9.2 percent of premium. (DeWeese Decl. ¶ 8.)

5

for an individual school plan or for a group plan for a multiple-school group shall seek and obtain competitive bids through a request for proposal process from qualified insurers at least once every 5 years commencing July 1, 2012. The administrator for any such group plan shall make the request for proposal responses available to requesting school administrative units, excluding any portions of the request for proposal responses considered to be confidential proprietary information by the submitting insurers. If any such individual school plan or group plan is subsequently self-insured, in whole or in part, the school board shall compare the overall cost of such a self-insured plan, including projected claims, all administrative expenses and reinsurance expenses, to the cost of insured products at least once every 5 years commencing July 1, 2012.

Id.

As amended 24-A M.R.S.A . § 2803-A(2) reads:

**Disclosure of basic loss information.** Upon written request, every insurer shall provide loss information concerning a group policy or contract to its policyholder, to a former policyholder or to a school administrative unit pursuant to Title 20-A, section 1001, subsection 14, paragraph E within 21 business days of the date of the request. This subsection does not apply to a former policyholder whose coverage terminated more than 18 months prior to the date of a request.

Id. Under this Maine statute, "loss information" is specifically defined as including "the amount of premium received, the amount of claims paid and the loss ratio" but not including "any information or data pertaining to the medical diagnosis, treatment or health status that identifies an individual covered under the group contract or policy." 24-A M.R.S.A. § 2803-A(1)(B). Although Maine statute previously has provided for policyholder and recent former policyholders to access loss information from their insurers, LD 1326 expanded this access to school districts.

**C.     MEABT & Loss Information**

MEABT purposely has structured the Trust as well as the Trust's relationship with its insurer to keep loss information under the MEABT plan as a confidential trade secret owned by the Trust. In fact, since 1993, MEABT's Trust Agreement has provided, in relevant part:

Fiduciary Authority. The Trustees shall have absolute discretion and authority to make all fiduciary decisions, plan provision interpretations and constructions, and

6

other determinations under this Trust and any plans maintained under the Trust, except as specifically delegated to the Plan Administrator in writing; including, without limitation, decisions relating to the use and dissemination (if any) of the participant claims experience data under any plan maintained under the Trust.

(First Amendment to Trust (Docket # 18-2) at PageID 209.) Additionally, since 2005, MEABT's Group Agreement with Anthem has provided in relevant part:

All experience data relative to the MEABT and its subgroups is owned by the Trust, and that data will not be released, either directly or indirectly, by Anthem without prior written consent of the Trust, and the Trust can withhold its permission for any reason it deems appropriate. Additionally, Anthem agrees not to utilize data relating to specific active subgroups for standalone rating purposes.

(See 2005-2006 Contract (Docket # 18-10) at Page ID 243; 2006-2007 Contract (Docket # 18-11) at Page ID 256; 2007-2008 Contract (Docket # 18-12) at PageID 270; 2008-2011 Contract (Docket # 18-13) at Page ID 276; 2009-2011 Contract (Docket # 18-14) at Page ID 282; 2011-2012 Contract (Docket # 18-15) at PageID 288.)

In accordance with these provisions, MEABT has always considered the experience ratings and claims history of individual districts to be proprietary, confidential, and a trade secret. (Burke Decl. ¶ 27.) The loss experience and claims history of the individual employers whose employees are enrolled in the MEABT plan are not known by anyone outside of Anthem, and in fact are not even known by individuals within the MEABT. (Burke Decl. ¶ 30.) In short, MEABT has always taken reasonable efforts to ensure the confidentiality of the experience data for each school district by not collecting nor allowing Anthem to use it. (Burke Decl. ¶ 28.) The purpose of keeping loss information confidential is to ensure that it is not used to defeat the purpose of the MEABT and its "community rated" design. (Burke Decl. ¶ 29.)

Generally, group insurers in Maine require "at least two years of aggregate loss information from an employer" to provide a quote. (Hamilton Decl. (Docket # 28) ¶ 3.) Thus, without access to loss information, school districts cannot meaningfully explore insurance

options outside MEABT. (See., e.g., Webb Decl. (Docket # 25) ¶¶ 8-12.) Over the years, Anthem and MEABT have denied multiple school district requests for loss information. (Burke Decl. ¶¶ 24 & 25; Burton Decl. (Docket # 16) ¶¶ 7 & 8.) Following the effective date of LD 1326, at least one district has already written Anthem with a renewed request for loss information. (See Letter from RSU 23, dated Oct. 5, 2011 (Docket # 16-1).)

In the absence of an injunction blocking LD 1326, it is apparent that school districts will continue to request loss information and will proceed to obtain quotes based on that loss information. Depending on the quotes and the terms of each district's collective bargaining agreement, this process may or may not result in some districts having their employees withdraw from the MEABT plan. (See Dench Decl. (Docket # 27) ¶¶ 8 & 9.) In most if not all cases, negotiating changes to the respective collective bargaining agreements is a lengthy process that takes "months if not years." (Dench Decl. ¶¶ 13-15.)

## IV. DISCUSSION

Mindful that the likelihood of success on a claim is the "sine qua non of th[e] four-part inquiry" for a preliminary injunction, the Court first considers the likelihood of success on Plaintiffs' unlawful taking claim. New Comm Wireless Servs, Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). The Court then considers the other three remaining factors.

### A. Likelihood of Success on the Merits

In Count II of the Amended Complaint, Plaintiffs claim that LD 1326 goes "beyond 'regulation' and effects a 'taking'" of the Trust's loss information in violation of the Takings Clause of the United States Constitution and the Maine Constitution. Ruckelhaus v. Monsanto

8

Co., 467 U.S. 986, 1005 (1984).[4] Plaintiffs' claim asserts a regulatory taking, rather than a physical taking. See, e.g., Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 125 (1st Cir. 2009). Regulatory takings are alternatively analyzed under either "a per se rule" or "an ad hoc analysis." Id. at 126. Here, the Court finds it is extraordinarily unlikely that Plaintiffs can prove that LD 1326 performs a physical taking or that the forced disclosure of loss information otherwise qualifies as a per se regulatory taking. See id. at 126 (explaining that "per se regulatory takings occur where the regulations completely deprive an owner of all economically beneficial use of her property") (internal quotations omitted); see also Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538 (2005) (noting that per se regulatory takings are "relatively narrow categories"). Rather, in the Court's preliminary assessment the only open avenue for Plaintiffs' takings claim is the "ad hoc analysis" guided by Penn Central Transp. Co. v. New York City, 438 U.S. 107 (1978). Franklin Mem'l Hosp., 575 F.3d at 126. Under Penn Central, three fact-intensive factors guide the Court's regulatory takings analysis: (1) "the extent to which the regulation has interfered with distinct investment-backed expectations;" (2) "the character of the governmental action;" and (3) "[t]he economic impact of the regulation on the claimant." 438 U.S. at 124. The Court's consideration of these factors "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539. The Court thus proceeds to analyze

---

[4] The Court proceeds to analyze Plaintiffs' takings claims as a facial challenge. While Plaintiffs argue that Count II presents both a facial challenge and as an as-applied challenge, any as-applied takings claim would not be ripe until either the State "has denied [the Trust] just compensation" or Plaintiffs have shown that they are relieved from seeking just compensation. Pharm. Care Mgmt Ass'n v. Rowe, 307 F. Supp. 2d 164, 180 n.17 (D. Me. 2004) (collecting cases). The record presented in connection with the motion for preliminary injunction simply does not support a finding that Plaintiffs have experienced a violation of the just compensation clause or that any state procedures for securing such just compensation are unavailable, inadequate or futile. See, e.g., Garcia-Ruberia v. Calderon, 570 F.3d 443, 453-54 (1st Cir. 2009). To support a preliminary injunction on an as-applied takings claim, Plaintiffs would need to satisfy their "burden of demonstrating ripeness," rather than simply arguing, as Plaintiffs do in their Reply, that they qualify for an exemption from the just compensation prong. Id. at 451.

9

each of these factors based on the record presented to assess whether Plaintiffs can prove that LD 1326 amounts to a taking of their claimed trade secret.[5]

### 1. Effect on Investment-Backed Expectations

"A reasonable investment-backed expectation' must be more than 'a unilateral expectation or an abstract need.'" Monsanto, 467 U.S. at 1005–06 (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)). As the Supreme Court explained in Monsanto, "the force of [the investment-backed expectations] factor" can be "so overwhelming . . . that it disposes of the taking question." Monsanto, 467 U.S. at 1005.

The Court necessarily acknowledges that it appears that MEABT has designed and invested in its community-rated plan based on an expectation that it could keep loss information secret. However, in recent years, Plaintiffs continued to receive requests from the districts for loss information and, in response to such requests, acknowledged an "aware[ness] that school districts are looking for ways to decrease their costs [related to health insurance]." (Ltr. From Christine Burke, dated Feb. 15, 2010 (Docket # 25-2) at Page ID 406; see also Burke Decl. ¶ 24.) Under these circumstances, MEABT's expectations that it would continue to be able to withhold recent loss information from school districts is best described as a unilateral expectation.

Nonetheless, Plaintiffs assert that the "the information at issue here was protected when generated" and that the Trust "could not have anticipated that the Legislature would enact [LD 1326]." (Pls. Mot. (Docket # 13) at 13.) This broad statement ignores the nature of insurance regulation. As the Court has already explained in ruling on the Motion to Dismiss, LD 1326's requirement that insurers, including Anthem, share loss information with school districts is a reasonable extension of existing insurance regulation. (See Order on Mot. to Dismiss at 9-10.)

---

[5] For purposes of the pending motion for preliminary injunction, the Court assumes without deciding that the loss information would qualify as a trade secret under Maine law. 10 M.R.S.A. § 1542(4).

In "highly regulated" industries, such as insurance, the courts repeatedly have acknowledged that investment-backed expectations must be "tempered." Franklin Mem'l Hosp., 575 F.3d at 128; see also Monsanto, 467 U.S. at 1007 (noting that expectations are necessarily adjusted in areas that "ha[ve] long been the source of public concern and the subject of government regulation").

Plaintiffs' argument regarding its investment-backed expectations also ignores the legislative history of LD 1326. LD 1326 was signed into law on June 21, 2011 and became effective on October 1, 2011. Given this legislative history, it is hard for the Court to see how Plaintiffs could have any reasonable investment-backed expectation that loss information generated following the passage of LD 1326 could remain a confidential, trade secret of the Trust.[6] See, e.g., Monsanto, 467 U.S. at 1006 (finding company could not have a reasonable investment-backed expectation that data submitted after effective date of statutory amendment would be confidential).[7]

In short, the current record does not support a finding that Plaintiffs' expectations are reasonable. Thus, the Court is hard pressed to find that Plaintiffs have a substantial likelihood of success on Count II. Nonetheless, the Court briefly considers the other two Penn Central factors.

### 2. Character of Government Action

This Penn Central factor favors finding a taking where the regulation "can be characterized as a physical invasion" or "completely extinguish[es]" a property right. 438 U.S.

---

[6] The Court notes that Plaintiffs signed their present contract with Anthem, which designates loss information as a trade secret owned by the Trust, after the passage of LD 1326 but prior to its effective date. (See 2011-2012 Contract (Docket # 18-5) at Page ID 288.) As the Supreme Court has held, "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 224 (1986).

[7] The Court notes that Plaintiffs have not argued that the taking analysis must be in any way bifurcated to separately assess MEABT's expectations prior to the passage of LD 1326 versus after the passage of LD 1326. In any event, the record suggests that school districts are most likely to seek the most recent two years of loss information. Thus, with each passing month, loss information that was generated prior to the passage of LD 1326 becomes less relevant.

at 124 & Franklin Mem'l Hosp., 575 F.3d at 129. In contrast, this Penn Central factor disfavors takings based on interference that "arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124. It is readily apparent that LD 1326 is more the latter and cannot be characterized as extinguishing or invading the Trust's property. The fact remains that the Trust is still entitled to access its group wide loss information and use it in any way it deems appropriate. LD 1326 indirectly prohibits only the Trust's attempt to keep the loss information of certain participating subgroups secret. As the Trust readily admits, it does not in any way use the loss information targeted by LD 1326. Rather, Defendant correctly characterizes the information as a "mere[ ] byproduct of Anthem's insurance operations." (Def. Response at 20.) On the record presented, LD 1326 reflects the Legislature's judgment that allowing school districts to access loss information will promote common good by promoting competition in the insurance market and allowing school districts to explore lower cost options for health insurance.

In short, the character of the government action here does not support finding a taking.[8]

**3. Economic Impact**

The economic impact factor focuses on "whether the regulation impairs the value or use of the property according to the owners' general use of their property" while giving due consideration to "the use to which the property owner puts her property" and the "economic impact . . . in the context of other laws and regulatory schemes." Philip Morris Inc. v. Reilly, 312 F.3d 24, 41 (1st Cir. 2004) (internal quotations and citations omitted).

---

[8] Citing Monsanto and Philip Morris, Plaintiffs appear to argue that a forced disclosure of a trade secret is necessarily a "tremendous individual loss" and that the Court should require the State to show a significant beneficial effect. (See Pls. Mot. at 15-16. (citing and quoting Philip Morris, 312 F.3d at 44).) In the Court's view, Plaintiffs' focus on the state's interest fundamentally misstates the law following Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 545 (holding that the "substantially advances" formula "is not a valid method of identifying regulatory takings"); see also Franklin Mem'l Hosp., 575 F.3d 121, 128 n.9.

Here, while MEABT uses its group loss information to shop for a community-rated insurance policy, the Trust "does not even organize [loss information] in a fashion where it is broken down by [school district]." (Burke Decl. (Docket # 18) ¶ 26.) In short, MEABT puts the loss information of individual school districts to no use unless one considers the act of concealing the data a stand-alone use. To the extent MEABT may use its group loss information to obtain quotes going forward, LD 1326 does nothing to impair this use.

On the record presented, the actual economic impact of LD 1326 is at this point a great unknown. To date, Plaintiffs have not compiled or reviewed loss information by district. Thus, while Plaintiffs assert that the loss information disclosure will sound the death knell for MEABT's community-rated plan, this assertion is, at best, an educated guess. In the absence of actual data, the parties have offered affidavits of dueling actuaries, which indicate that the impact of LD 1326 and the subsequent departure of school districts from the MEABT plan is a debatable matter. (Compare DeWeese Decl. ¶ 27 (indicating that a "phenomenon . . . relatively well known in the group insurance industry" called the "assessment spiral or death spiral" may result) with Diamond Decl. ¶ 9 (indicating that "it does not necessarily follow that the end result for [MEABT] will be the 'death spiral' predicted by Mr. De Weese").)

Under these circumstances, while Plaintiffs may ultimately prove the requisite economic impact to support this Penn Central factor, the Court cannot say that the current record clearly shows the requisite economic impact.

**B. Irreparable Harm**

Given the Court's assessment of the economic impact factor, it should come as no surprise that the Court concludes that the record does not support a finding of irreparable harm.

13

As the record shows, in the absence of an injunction, school districts will continue to request, and Anthem will be required to supply, loss information. With loss information in hand, MEABT fully anticipates that some school districts will leave the Trust in favor of insurance companies that are offering lower premiums in the near term. If and when school districts with favorable experience and cost factors leave the Trust, the price of insurance for the remaining pool will increase. (Benoit Decl. (Docket # 17) ¶ 11.) On the record currently before the Court, the extent of these defections is debatable and the process by which any defections occur will "take months if not years." (Dench Decl. ¶¶ 13-16.)

The fact remains that this litigation remains on track to be ready for trial by October 2012. (See Scheduling Order (Docket # 34) & Order Amending Scheduling Order (Docket # 56).) The record simply does not support a finding that MEABT will suffer irreparable harm before that date if LD 1326 is not enjoined.[9]

### C. Balance of the Harms & Public Interest

When it appears that a plaintiff has a substantial likelihood of success or will suffer irreparable harm, the Court readily acknowledges that a preliminary injunction may be entered to preserve the status quo while the litigation remains pending. In this case, neither of the first two preliminary injunction factors weigh in favor of preserving the status quo. Thus, even if the balance of the harms and the public interest weighed in favor of Plaintiffs, a preliminary injunction would not be appropriate. In any event, the Court readily concludes that the balance of the harms and public interest favor denying preliminary injunctive relief in this case.

---

[9] To the extent that Plaintiffs cite cases in which courts have found irreparable harm based on the impending loss of health insurance benefits, the Court notes that the record presented does not support a finding that any particular participant in the MEABT plan is in danger of losing their health insurance in the absence of an injunction. (See Pls. Mot. at 22-23.)

14

## V. CONCLUSION

Ultimately, the Court concludes that Plaintiffs have not established a substantial likelihood of success or the necessary irreparable harm. Having given due consideration to all of the relevant factors, the Court hereby DENIES Plaintiffs' Motion for Preliminary Injunction (Docket # 13).

SO ORDERED.

                                          /s/ George Z. Singal
                                          United States District Judge

Dated this 3rd day of February, 2012.